IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

Carmen Latrice Rice, #308637,     )   Civil Action No.:2:16-cv-02610-RBH-MGB
                                )
                  Petitioner,  )
                                )
                                )   **REPORT AND RECOMMENDATION**
       v.                      )   **OF MAGISTRATE JUDGE**
                                )
Warden, Leath Correctional Institution,  )
                                )
                 Respondent.  )

       The Petitioner ("Petitioner" or "Rice"), a state prisoner proceeding *pro se*, seeks habeas relief pursuant to 28 U.S.C. § 2254. This matter is before the Court on the Respondent's Motion for Summary Judgment. (Dkt. No. 16; *see also* Dkt. No. 15.)

       Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(c), D.S.C., this magistrate judge is authorized to review the instant petition for relief and submit findings and recommendations to the District Court.

       The Petitioner filed the instant action on or about July 13, 2016. (*See* Dkt. No. 1 at 17 of 17.) On November 28, 2016, Respondent filed a Motion for Summary Judgment. (Dkt. No. 16; *see also* Dkt. No. 15.) By order filed November 29, 2016, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the Petitioner was advised of the summary judgment procedure and the possible consequences if she failed to adequately respond to the motion. (Dkt. No. 17.) On or about January 3, 2017, Petitioner filed a Response in Opposition to the Motion for Summary Judgment. (Dkt. No. 19.)

## PROCEDURAL HISTORY

       The Petitioner is currently confined within the South Carolina Department of Corrections ("SCDC") at Leath Correctional Institution. In March of 2004, the Richland County Grand Jury indicted Petitioner for murder and armed robbery. (R. at 1158-61.) Petitioner was represented by John T. Mobley, Esquire, and Christopher Hart, Esquire. (*See* R. at 1.) Petitioner proceeded to a jury trial before the Honorable Reginald I. Lloyd on April 4-8 of 2005. (R. at 1-1157.) On April 8, 2005,

the jury found Petitioner guilty as charged. (R. at 1147-51.) That same day, Judge Lloyd sentenced Petitioner to life in prison on the conviction for murder; he sentenced her to thirty years, concurrent, on the conviction for armed robbery. (R. at 1156.)

Petitioner appealed and was represented by Robert M. Dudek, Esquire, of the South Carolina Commission on Indigent Defense. (*See* Dkt. No. 15-1.) In her Final Brief of Appellant filed on March 15, 2007, Petitioner raised the following issues:

> 1. Whether the Court erred by refusing to allow defense witness Alana Quattlebaum to testify that co-defendant Iris Bryant told her in jail that Nikki was with her when the decedent was killed, and that Nikki shot the decedent, since Bryant on a prior occasion had told the police Nikki was present, and Bryant later testified that admission was a lie, and she denied at trial making this statement to Quattlebaum, since this was an admissible prior inconsistent statement, and the judge's reason for excluding it as evidence of third-party guilt was also erroneous?

> 2. Whether the Court erred by allowing investigator Smith to testify he was told by another law enforcement official that appellant did not want to submit to her fingerprints being taken, since this testimony was hearsay and was very prejudicial?

> 3. Whether the Court erred by allowing waitress Heidi Feagin to make an in-court identification of appellant, where she previously was not only unable to identify appellant, she also misidentified two other women in the photo array, since the judge erroneously ruled appellant opened the door to this unreliable in-court identification by cross-examining Feagin?

> 4. Whether the Court erred by admitting records and the attendant testimony from the security company where appellant was employed under the business records exception, since the records were not "trustworthy" within the meaning of Rule 803(6), SCRE, where the company went bankrupt and the custodian of records and other evidence indicated the poor bookkeeping made it possible for thirty-three guns not to be accounted for, including one the state strongly insinuated belonged to appellant, and the probative value of this "bad employment acts" and gun evidence was also outweighed by its unduly prejudicial effect under Rule 403, SCRE?

> 5. Whether the court erred by refusing to give a curative instruction where the solicitor argued the jury should convict appellant to give decedent's wife and the decedent justice, since this was an improper appeal to the sympathy and passion of the jury?

(Dkt. No. 15-1 at 6-7 of 36.)

In a published opinion dated October 5, 2007, the South Carolina Court of Appeals affirmed the judgment of the lower court. *See State v. Rice*, 375 S.C. 302, 652 S.E.2d 409 (Ct. App. 2007). On November 26, 2007, Petitioner, through Attorney Dudek, filed a petition for rehearing. (*See* Dkt. No. 15-4.) The petition for rehearing was denied on January 2, 2008. (*See* Dkt. No. 15-5.) On April 2, 2008, Petitioner, represented by Mr. Dudek, filed a petition for writ of certiorari. (*See* Dkt. No. 15-6.) On December 4, 2008, the South Carolina Supreme Court denied the petition for writ of certiorari. (Dkt. No. 15-8.) The matter was remitted to the lower court on December 8, 2008. (Dkt. No. 15-9.)

On January 14, 2009, Petitioner filed an application for post-conviction relief ("PCR"). (R. at 1164-71.) In her application, she contended she was in custody unlawfully for the following reasons:

(a) Ineffectiveness of counsel

(b) Judicial violation

(c) Search, Seizure and Investigator's violation of procedure

(d) Miranda improperly done

(e) Incomplete discovery/Brady prior to trial

(f) Sentence on basically . . . hearsay; no tangible evidence.

(R. at 1165.) Petitioner specifically asserted her counsel was ineffective as follows (verbatim):

1. The attorney did not provide the Defendant a complete Motion of Discovery and Brady with all favorable material in accordance to *Maryland v. Brady* . . . with sufficient time to prepare rebuttal.

2. The attorney did not insist on the suppression of incredible witnesses statement or testimony.

3. The Defendant was charged and convicted on hearsay of witnesses in a case of four (4) years old whereas witnesses in her behalf nor she could recall evidence or whereabouts.

4. No tangible evidence was presented at the trial.

5. Witness for the prosecution did not pick the Defendant out of any lineup, however pick out the prosecution chief witness.

6. The Defendant *Miranda Rights* was not given to her during the time of the investigator's questioning. The Defendant was given false information as to why she was being questioned at the beginning of interrogation by investigators who came to the Defendant's home.

6. All witnesses for the prosecution was in jail/detention/and or prison and was coerced into testifying.

7. The *Rule of Evidence 708* was violated . . . at the trial.

(R. at 1168-70.)

On June 6, 2011, an evidentiary hearing was held before the Honorable James R. Barber, III. (R. at 1180-1241.) Petitioner was present and represented by Mark Schnee, Esquire. (*See* R. at 1180.) In an order filed August 22, 2011, Judge Barber denied the application for post-conviction relief and dismissed the petition. (R. at 1244-56.)

Petitioner appealed, and on September 21, 2012, through Attorney Kathrine H. Hudgins of the South Carolina Commission on Indigent Defense, filed a Petition for Writ of Certiorari. (Dkt. No. 15-10.) Therein, Petitioner raised the following issues:

1.) Did the PCR judge erroneously find that the statement of Arletta Frierson that Iris Bryant, the co-defendant and the State's main witness at trial, told her that the petitioner had nothing to do with the murder of Bernard Brennan was inadmissible hearsay when the statement of Frierson was admissible as impeachment testimony and not hearsay pursuant to Rule 801(d)(1)?

2.) In finding that the statement of Arletta Frierson was inadmissible, did the PCR judge err in failing to make findings of fact and conclusion[s] of law as to the allegation that trial counsel was ineffective for failing to call Arletta Frierson as a witness at trial to testify that the co-defendant and the State's main witness, Iris Bryant, admitted that petitioner had nothing to do with the murder of Bernard Brennan?

3.) Did the PCR judge err in refusing to make findings of fact and conclusions of law as to the allegation that trial counsel was ineffective in failing to locate and call La Shawn Roberts as a witness at trial to testify that the co-defendant and the State's main witness, Iris Bryant, admitted that petitioner had nothing to do with the murder of Bernard Brennan?

(Dkt. No. 15-10 at 3 of 15.)

After the case was transferred to the South Carolina Court of Appeals, on May 21, 2014, the South Carolina Court of Appeals granted the petition and ordered further briefing. (Dkt. No. 15-12.) In an unpublished opinion filed April 8, 2015, the South Carolina Court of Appeals affirmed the decision of the PCR court. (*See* Dkt. No. 15-15.) Rice filed a petition for rehearing; the South Carolina Court of Appeals denied the petition on May 19, 2015. (Dkt. No. 15-16; Dkt. No. 15-17.) On June 18, 2015, Petitioner filed a petition for writ of certiorari in the South Carolina Supreme Court. (Dkt. No. 15-18.) The Supreme Court of South Carolina denied the petition on November 4, 2015. (Dkt. No. 15-20.) The matter was remitted to the lower court on November 9, 2015. (Dkt. No. 15-21.)

On or about July 13, 2016, Petitioner filed the instant habeas petition, wherein she raised the following grounds for review (verbatim):

> **GROUND ONE**: Ineffective assistance of counsel
> **Supporting facts**: The Court of Appeals erred in finding that if trial counsel was deficient for failing to call Frierson as a witness, petitioner failed to show prejudice because the testimony was merely cumulative when the PCR judge did not rule on the merits of the ineffective assistance of counsel claim and did not find the testimony merely cumulative.
>
> **GROUND TWO**: No physical evidence was pointing to me as the person that committed the crime
> **Supporting facts**: They had DNA and fingerprints but none matched mine.
>
> **GROUND THREE**: [T]he trial court err[ed] by ruling a prior inconsistent statement concerning third-party guilt admissible.
> **Supporting facts**: Because this was a murder trial where someone was deceased and another incarcerated for life, due to false statements by the State's key witness.
>
> **GROUND FOUR**: The trial court erred by premitting [sic] an in-court identification that was unreliable.
> **Supporting facts**: Feag[i]n was giving a photo line-up of all individuals including the suspect (me Carmen) and I wasn't picked out until placed in court on trial between two attornies [sic] charged w/ murder & armed robbery.

(Dkt. No. 1 at 6-11 of 17.)

## APPLICABLE LAW

**Summary Judgment Standard**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" *Id.* (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)); *see also Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990).

**Habeas Standard of Review**

Since the Petitioner filed her petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of her claims is governed by 28 U.S.C. § 2254(d), as amended. *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997); *Breard v. Pruett*, 134 F.3d 615, 618 (4th Cir.1998). Under the AEDPA, federal courts may not grant habeas corpus relief unless the underlying state adjudication:

> 1. resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2. resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 398 (2000). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 410. "A state court's determination

that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

## DISCUSSION

As noted above, Respondent seeks summary judgment in the instant case. (Dkt. No. 16; Dkt. No. 15.) Before turning to the grounds for relief, the undersigned will briefly review some of the evidence presented at Petitioner's trial.

As noted above, in March of 2004, the Richland County Grand Jury indicted Petitioner for murder and armed robbery. (R. at 1158-61.) She proceeded to a jury trial on April 4 through April 8 of 2005. (R. at 1-1157.) At trial, Sergeant Tom Lyons with the Richland County Sheriff's Department testified that, either during the late hours of October 25, 2001, or the early morning hours of October 26, 2001, the Sheriff's Office received a call about a single car accident in the area of Crawford Road. (R. at 127-30.) Sergeant Lyons testified that a Mercedes vehicle was off the side of the roadway and in the ditch. (R. at 129-31.) He stated that inside the vehicle was a deceased individual "slouched over toward the right side of the vehicle." (R. at 130-31.) Sergeant Lyons stated, "It appeared that he had some wounds to his back. And then the windshield was--had what appeared to be bullet holes in it." (R. at 131.) Lyons described the area as "secluded." (R. at 137.)

Robert Turnley, at the time an investigator with the Richland County Sheriff's Office, responded to the scene. (R. at 141-46.) He testified that when he arrived on scene, the vehicle was still in gear and running, and the headlights were on. (R. at 150.) The deceased individual was still wearing his seat belt, and his "left pants pocket was . . . pulled out." (R. at 150.) Mr. Turnley stated that he "observed what appeared to be four to five gunshot wounds to [the decedent's] upper left shoulder and back area"; Turnley stated that he "also observed what, based on [his] experience, [he] kn[e]w to be gun powder residue" on the back of the decedent's shirt. (R. at 150-51.) Turnley further testified that there was gunpowder residue on the back of the driver seat, which would be "consistent

with somebody firing from the back seat." (R. at 156-57.) Mr. Turnley testified that on October 26, 2001, the decedent was identified as Bernard Brennan. (R. at 158-59.)

Alton Page testified that he played pool with Mr. Brennan on the night he was murdered at a place called the Varsity. (R. at 282.) Page testified that while they were playing pool, Mr. Brennan got a phone call and "[w]hoever he was talking to, he told them to just come on down." (R. at 285.) Page stated that approximately 20 to 25 minutes later, two young ladies walked in. (R. at 285.) Page testified that Brennan did not introduce the ladies but that Brennan "said one of [the ladies] was his cousin from New York and the other one was her friend from Beaufort." (R. at 285-86.) When asked to describe the two women, Page stated,

> They were about my height and kind of slim built. One of them had on a jacket, the one from--he said was from Beaufort had on a jacket. And the other one had on a bright orange top, I remember that.

(R. at 286.)[1] Page testified that, on the night in question, Mr. Brennan had a "good bit" of cash on him; Page stated that someone asked to Brennan to borrow money, and Brennan "told him he didn't have nothing but hundreds on him." (R. at 290-91.) Page stated that Mr. Brennan had "a wad of hundreds" on him that "looked like about a couple thousand [dollars] or maybe more." (R. at 291.)

Iris Bryant, Petitioner's co-defendant, testified that she was from Beaufort and that she met Petitioner in October of 2001. (R. at 504, 508-09.) She testified that after she met Bernard Brennan at the Hot Spot off Farrow Road, she saw him a few more times. (R. at 510-12.) According to Bryant, Bryant gave Mr. Brennan's phone number to Petitioner, and Petitioner "beg[a]n to get to know Mr. Brennan." (R. at 511-12.) Bryant testified that on October 25, 2001, Petitioner picked her up and "told [her] that Bernard [Brennan] was going to be taking [them] out and get something to eat." (R. at 512.) Bryant testified as follows, "We stopped by the Hot Spot, got a cigar to smoke a blunt, went downtown to the Varsity, went in there, came out, went to Calloways, [Petitioner] got something to eat, got in the car . . . ." (R. at 512.) According to Bryant, when they left Calloways

---

[1] However, Page was not able to identify the two ladies. (R. at 290.)

in a Mercedes, Mr. Brennan was driving, Bryant was in the passenger seat, and Petitioner was sitting behind Mr. Brennan. (R. at 515.) Bryant testified that she was wearing a "gray hoody and some jeans," and Petitioner was wearing some jeans and "an orange pullover sweater." (R. at 514-15.)

Bryant testified that after leaving Calloways, they got on Interstate-20 and exited at the Fairfield Road Exit. (R. at 515-16.) She stated that they drove down Crawford Road around 9 or 9:30 that night. (R. at 516.) She further testified as follows:

> We're riding, you know, and--we're riding down the street, right. We were listening to music because I'm changing like the C.D. player. Carmen lit a cigarette. And then he was like nobody can smoke in his car. So when I turned around to tell her, she had a gun out, you know what I'm saying, she had--a gun was out. I told her, I ain't want to be a part of that. She just looked at me, pointing the gun at his head and was like, Stop the car, you know what I'm saying, let her out.
> . . .
> When I got out of the car, I didn't even have time to shut the door, there were some words. I heard some shots. The car started rolling. It stopped. She got out, shot some more, like twice, told me to stand by the trunk.
> I was crying, you know what I'm saying, because if you would have seen it, I mean, there was nothing I could do. . . .
> Then she started wiping the car down, took his wallet, was like, Come on, you know what I'm saying. The whole time I'm scared, this girl got a gun, you know. I just seen what she could do. She told me to come on. We got in the woods. She made--she made me run. We ran down another street.

(R. at 516-17.) Bryant testified that Petitioner threw the victim's wallet down a storm drain and threw the shells "down a drainpipe." (R. at 518-20.) She stated that they ran to an Exxon gas station, where someone Petitioner knew picked them up; she and Petitioner were driven to Anthony's, which was closed by that time. (R. at 519-21.) Bryant testified that Petitioner then "took off her wig, her orange sweater and her jeans and threw them in this oil container behind Anthony's." (R. at 521.) According to Bryant, Petitioner "had on some more clothes under it," and from there, they walked to Petitioner's house, which was right around the corner. (R. at 521.)

Bryant admitted that she knew money was going to be taken from Mr. Brennan that evening, and she testified that she had previously seen Brennan with a lot of cash, as he "was flashing it." (R.

at 523-24.) She stated, however, that she did not know that a gun was going to be involved. (R. at 523.)

As noted above, on April 8, 2005, the jury found Petitioner guilty of murder and armed robbery. (R. at 1147-51.)

### A.     Ground One

In Ground One, Petitioner asserts ineffective assistance of counsel. As supporting facts, Petitioner states,

> The Court of Appeals erred in finding that if trial counsel was deficient for failing to call Frierson as a witness, petitioner failed to show prejudice because the testimony was merely cumulative when the PCR judge did not rule on the merits of the ineffective assistance of counsel claim and did not find the testimony merely cumulative.

(Dkt. No. 1 at 6 of 17.)[2] The undersigned interprets Ground One as a claim that counsel was ineffective for failing to call Arletta Frierson as a witness at trial.

The United States Supreme Court has said that a meritorious ineffective assistance of counsel claim must show two things: first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984). A court's evaluation of counsel's performance under this standard must be "highly deferential," so as to not "second-guess" the performance. *Id.* at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks and citation omitted); *see also Bowie v. Branker*, 512 F.3d 112, 119 n.8 (4th Cir. 2008); *Fields v. Att'y Gen. of Md.*, 956 F.2d 1290, 1297–99 (4th Cir. 1992); *Roach v. Martin*, 757 F.2d 1463, 1467 (4th Cir. 1985).  In order to establish the second prong of *Strickland*, "[t]he defendant must show that

---

[2]The undersigned notes that Petitioner also claims the PCR court "erred in refusing to make findings and conclusions of law" as to the testimony of LaShawn Roberts. (*See* Dkt. No. 19 at 1 of 4.) To the extent Petitioner claims error in her state PCR proceedings, such claims are not cognizable herein. *See Bryant v. Maryland*, 848 F.2d 492, 493 (4th Cir. 1988) (holding that errors in state PCR proceedings are not cognizable on federal habeas review).

there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" has been defined as "a probability sufficient to undermine confidence in the outcome." *Id.* While *Strickland* itself is a deferential standard, when both § 2254(d) and *Strickland* apply, "review is doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Indeed, when § 2254(d) applies, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

As noted above, Iris Bryant testified at trial that Petitioner murdered Bernard Brennan. Petitioner contends that counsel was ineffective in failing to call Ms. Frierson as a witness because Ms. Frierson would have testified that Ms. Bryant told Frierson that Petitioner had nothing to do with the murder. As noted by the PCR court,

> The Applicant explained that she did not testify at trial because of trial counsel's advice. She said that had she testified at trial she would have told the Court that she was not wearing the clothes that the witnesses claimed that she was wearing, and that she had no involvement with the murder or the armed robbery. She further explained that she was issued a "new" gun every day for work and that she had turned in her gun. The Applicant said her gun was a 357 Magnum with hollow point ammunition, and she was adamant that she had returned it. She also testified that she was not at the club that evening and she had nothing to do with the crime. She said that she had a history with the co-defendant and that the two shared a unit at the detention center.

(R. at 1251.)

During the PCR hearing, Petitioner's attorney attempted to have Petitioner testify that Bryant told Petitioner that Bryant "was going to lie to get [a] deal." (R. at 1186-87.) When the Assistant Attorney General objected and argued that statement was hearsay, Petitioner's counsel argued the statement was not hearsay because "[i]t would be a statement against interest for Ms. Bryant to acknowledge that she will or has committed perjury." (R. at 1187.) The PCR judge asked whether Petitioner's counsel had attempted to locate Ms. Bryant; counsel stated that he "tried contacting her last known address," and "[t]here has been no answer anywhere that [he] knew of." (R. at 1187.) The PCR judge sustained the Assistant Attorney General's objection. (R. at 1186-87.)

As the PCR judge noted, Petitioner proffered the testimony of Arletta R. Frierson at the PCR hearing. (*See* R. at 1251.) The PCR judge further noted that Ms. Frierson's testimony "was related to one or more supposed hearsay statement(s) against interest from the codefendant (who testified at the trial)." (R. at 1251.) At the PCR hearing, Petitioner's counsel stated that he understood the court's ruling as to the hearsay exception, but he also argued "that it would . . . fall under Rule 801 as an admission by a party opponent" and asked that the court allow him to proffer the testimony of Ms. Frierson. (R. at 1192.)

Ms. Frierson testified on proffer that she was incarcerated with Iris Bryant. (R. at 1196.) Ms. Frierson further stated:

> Q. Okay. Did you have any conversations with [Iris Bryant] about her charges and what she was doing with them?
>
> A. Yes, we had conversations.
>
> Q. Okay. Could you describe some of those conversations?
>
> A. Well, I mean, I was at Alvin S. Glenn, and that's when we first started talking about it. When her and Carmen used to have their little altercations, she just basically said that--***she did say that Carmen had nothing to do with it*** and she stated a couple of times that if Carmen kept on with her nonsense that she said she held--she said she held Carmen's life in her hand. ***She said the only thing she had to do was to tell the truth and Carmen could be set free.***
>
> Q. Do you remember if she said that more than once or one time?
>
> A. She said it a lot of times.
>
> Q. Were you friends with her?
>
> A. She's actually--that's my cousin.

(R. at 1196 (emphasis added).) Frierson further testified:

> Q. Okay. Did [Iris Bryant] tell you why she wanted to testify against Carmen?
>
> A. She was trying to get a deal.
>
> Q. Okay. Did she dislike Carmen or . . .

A. I'm not for sure she disliked her. I just think that she was trying to go home to her kids, so she was trying to do what she needed to do for herself.

(R. at 1197.)

After redirect examination was over, the PCR judge asked some questions of Ms. Frierson. (R. at 1199-1200.) Ms. Frierson indicated that she had not seen Ms. Bryant for approximately three years, but that Ms. Frierson has family--including her children, a grandmother, and some siblings--in Columbia. (R. at 1199-1200.)

The PCR judge's order indicates that he sustained the State's objection to the testimony of Arletta R. Frierson pursuant to Rule 804(b)(3) of the South Carolina Rules of Evidence. (*See* R. at 1244 n.1.)[3] The PCR court's order states, *inter alia*,

> This Court sustained the Respondent's Rule 804(b)(3), SCRE objection because there had been no showing that the co-defendant (Iris Bryant) herself was unavailable for the purposes of a Rule 804, SCRE hearsay exception. It is the hearsay proponent's burden to demonstrate unavailability of the declarant. State v. Kinlock, 338 S.C. 385 (2000). The Applicant additionally argued that the co-defendant's statement was admissible as a statement by a party-opponent. Because this was not a joint trial, the co-defendant was not a party at the trial and is not a party for the PCR hearing. Therefore, the opposing party for the purposes of Rule 801(d)(2), SCRE is the State. The Court did not allow the statement to be admitted as one against a party-opponent.

(R. at 1252.) In a footnote, the PCR court stated, "Rule 801(d)(2)(B), SCRE does not apply." (R. at 1252 n.6.) In a different footnote, the PCR court stated,

> To be clear, the proffered testimony suggested that the co-defendant made statements to other inmates (both before and after the Applicant's trial) that the Applicant had nothing to do with the crime, that she (the co-defendant) admitted she was lying when she testified that the Applicant was the murderer. This Court notes for the purposes of the record that the proffered witnesses were not credible. On a final note, it appears that one of the witnesses the Applicant proffered at the PCR hearing was listed as a potential witness at the trial, but did not testify. (Trial transcript, p. 21 L. 7-8, p. 974 L. 6). In addition, the appellate court addressed some of the issue(s) with the co-defendant's statements:

---

[3] Rule 804(b)(3) of the South Carolina Rules of Evidence provides that a "statement against interest" is "not excluded by the hearsay rule if the declarant is unavailable as a witness." S.C. R. EVID. 804(b)(3).

> The evidence Rice asserted in support of introducing the third-party
> guilt testimony implicated Nikki at times, and Tiki at times, with no
> clarification as to whether they were the same individual. The record
> is void of facts or circumstances, other than Bryant's inconsistent
> statements, linking anyone other than Rice to Brennan's murder. The
> proffered evidence cases a mere "bare suspicion" on Nikki or Tiki
> and fails to connect either to the murder by way of the facts and
> circumstances surrounding the crime.

State v. Rice, 375 S.C. 302, 322, 652 S.E.2d 409, 419.

(R. at 1251-52 n.5.)[4]

As noted above, Petitioner sought appellate review of the denial of her application for post-conviction relief, and the South Carolina Court of Appeals granted the petition for writ of certiorari and ordered further briefing. (Dkt. No. 15-12.) In an unpublished opinion filed April 8, 2015, the South Carolina Court of Appeals affirmed the decision of the PCR court. *See Rice v. State*, No. 2015-UP-191, 2015 WL 1546200 (S.C. Ct. App. Apr. 8, 2015). First, the South Carolina Court of Appeals found the following issue "unpreserved": "whether Frierson's testimony was admissible at the PCR hearing under Rule 801(d)(1)(A), SCRE, as a prior inconsistent statement." *Rice*, 2015 WL 1546200, at *1. The court further stated,

> We find the PCR court's decision that trial counsel was not ineffective for failing to
> call Frierson as a witness at trial is supported by the evidence. *See Taylor v. State*,
> 404 S.C. 350, 359, 745 S.E.2d 97, 101 (2013) ("On appeal in a PCR action, this
> [c]ourt applies an 'any evidence' standard of review."); *Shumpert v. State*, 378 S.C.
> 62, 66, 661 S.E.2d 369, 371 (2008) ("A PCR court's findings will be upheld on
> review if there is any evidence of probative value supporting them."). During Rice's
> trial, Iris Bryant testified regarding Rice's involvement in a murder. Bryant testified
> she and Rice were with Bernard Brennan (Victim) on the night Victim was
> murdered. According to Bryant, Victim drove her and Rice to a secluded road, and
> Rice shot Victim from the back seat of the vehicle. Alana Quattlebaum testified at
> trial that she was incarcerated with Frierson and Bryant. Quattlebaum claimed Bryant
> told her and Frierson that Rice did not have anything to do with the crime. Trial
> counsel did not call Frierson to testify at trial. At the PCR hearing, Frierson proffered
> testimony that Bryant told her that Rice "had nothing to do with" Victim's murder.
>
> Even assuming trial counsel was deficient for failing to call Frierson, Rice failed to
> show prejudice. *See Southerland v. State*, 337 S.C. 610, 616, 524 S.E.2d 833, 836

---

[4]It does not appear that "Nikki" or "Tiki" were ever identified. (*See infra* n.6.)

(1999) (stating in order to obtain PCR relief for ineffective assistance of counsel, "[f]irst, the burden of proof is upon petitioner to show that counsel's performance was deficient as measured by the standard of reasonableness under prevailing professional norms. Second, the petitioner must prove that he or she was prejudiced by such deficiency to the extent of there being a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (emphasis omitted)).

Through Quattlebaum's testimony, the jury was informed that Bryant admitted Rice did not have anything to do with the crime. Accordingly, Frierson's testimony would have been merely cumulative, and trial counsel was not ineffective. *See Edwards v. State*, 392 S.C. 449, 459, 710 S.E.2d 60, 66 (2011) ("We previously have held where evidence produced during PCR proceedings is cumulative to or does not otherwise aid evidence introduced at trial, no prejudice results from counsel's failure to bring it forward.").

*Rice*, 2015 WL 1546200, at *1-2.

Petitioner is not entitled to habeas relief on Ground One. As the PCR court noted, counsel testified at the PCR hearing that his "strategy was to discredit the State's witnesses." (R. at 1253.) Trial counsel testified at the PCR hearing that Iris Bryant "making up stories" was "nothing new" to him. (R. at 1214.) He stated,

I mean, we crossed--I crossed [Bryant] pretty extensively on different versions, different stories, the fact that she was facing life in prison just like my client was and that, you know, I knew she wrote several different letters to law enforcement and that she gave different versions and things along those lines. So, yeah, I mean, that's not--that's nothing earth-shattering.

(R. at 1214.) And indeed, a review of the trial transcript reveals that, during counsel's cross-examination of Bryant, Bryant admitted that she previously lied under oath numerous times. (*See, e.g.*, R. at 531-50.)

Furthermore, as noted by the PCR court, Alana Quattlebaum did testify at Petitioner's trial. (*See* R. at 962-73.) Ms. Quattlebaum testified that while she was incarcerated at the Alvin S. Glenn Detention Center, she had an opportunity to interact with both Petitioner and Iris Bryant. (R. at 963-64.) She testified that her previous roommate was Arletta Frierson, who was Bryant's first cousin. (R. at 964-65.) Quattlebaum further testified as follows:

Q. Okay. And because you were rooming with Iris Bryant's cousin, did you have an opportunity to, I guess, just interact with Iris sometimes?

A. Yes, sir.

Q. Okay. Was there a time when you were--and Iris's cousin, Arletta, were doing Iris' hair?

A. Yes, sir.

Q. Okay. Why don't you tell the jury about what happened and any kind of conversation that took place?

A. I was doing Iris Bryant's hair in braids. And her cousin, we call her Lee-Lee, her name is Arletta Frierson, she asked Iris what happened. And Iris said she didn't want to talk about it. And then Arletta asked her again. She said, Well, what Carmen-- what did Carmen do? She said she was going to tell the truth that Carmen had nothing to do with it.

(R. at 965.)

Thus, while counsel did not call Frierson as a witness at trial, he certainly was able to get Bryant's statement that Petitioner had nothing to do with the crime before the jury. This fact--combined with counsel's extensive cross-examination of Bryant, wherein Bryant admitted twenty times or more that she had previously lied about the case to authorities, indicates to the undersigned that the state court's rejection of this claim of ineffective assistance of counsel was not contrary to, or an unreasonable application of, clearly established federal law, nor was the state court's decision based upon an unreasonable determination of the facts. *See Blakeney v. Branker*, 314 F. App'x 572, 593-94 (4th Cir. 2009) (affirming denial of habeas relief on claim that counsel was ineffective in failing to present additional character witnesses, stating, "the additional character evidence testimony was substantially cumulative and, thus, can reasonably be said to have no more than a *de minimis* [e]ffect on a reasonably objective juror evaluating the evidence and the aggravating and mitigating circumstances in defendant's case"); *Winfield v. Roper*, 460 F.3d 1026, 1034 (8th Cir. 2006) ("We conclude that the failure to present cumulative testimony is not contrary to, or an unreasonable application of, federal law, and that [the petitioner] suffered no prejudice by counsel

not calling these witnesses." (citation omitted)); *United States v. Harris*, 408 F.3d 186, 191 (5th Cir. 2005) ("This Court has previously refused to allow the omission of cumulative testimony to amount to ineffective assistance of counsel." (citation omitted)). The undersigned recommends granting summary judgment to Respondent as to Ground One.

**B.** **Ground Two**

In Ground Two, Petitioner asserts she is entitled to habeas relief because there was "[n]o physical evidence . . . pointing to [her] as the person that committed the crime." (Dkt. No. 1 at 8 of 17.) She asserts that investigating authorities "had DNA and fingerprints but none matched" hers. (Dkt. No. 1 at 8 of 17.)

Respondent contends Ground Two is procedurally defaulted because Petitioner did not raise this ground on direct appeal. (*See* Dkt. No. 15 at 30.) For the reasons set forth below, the undersigned agrees with Respondent.

"Federal habeas review of a state prisoner's claims that are procedurally defaulted under independent and adequate state procedural rules is barred unless the prisoner can show cause for the default and demonstrate actual prejudice as a result of the alleged violation of federal law, or prove that failure to consider the claims will result in a fundamental miscarriage of justice." *Lawrence v. Branker*, 517 F.3d 700, 714 (4th Cir. 2008) (quoting *McCarver v. Lee*, 221 F.3d 583, 588 (4th Cir. 2000)). Procedural default may be excused if the Petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Martinez v. Ryan*, 566 U.S. 1, 9 (2012). In the alternative for showing cause and prejudice, a petitioner may attempt to demonstrate a miscarriage of justice, e.g., actual innocence, *Bousley v. United States*, 523 U.S. 614, 623 (1998); *see also Schlup v. Delo*, 513 U.S. 298, 327 (1995), or abandonment by counsel. *Maples v. Thomas*, 565 U.S. 266, 283 (2012) (inquiring "whether [the petitioner] ha[d] shown that his attorneys of record abandoned him, thereby

supplying the extraordinary circumstances beyond his control, necessary to lift the state procedural bar to his federal petition" (internal quotation marks and citations omitted)).

Petitioner did not raise the issue set forth in Ground Two on direct appeal. (*See* Dkt. No. 15-1 at 6-7 of 36.) Failure to do so means Ground Two is procedurally defaulted in the instant action. *See Justus v. Murray*, 897 F.2d 709, 711 (4th Cir. 1990) (habeas claim "concerning the sufficiency of the evidence supporting [the petitioner's] death sentence" was procedurally defaulted because it was not raised on direct appeal); *see also* S.C. CODE ANN. § 17-27-20(A)(6) (stating that § 17-27-20 "shall not be construed to permit collateral attack on the ground that the evidence was insufficient to support a conviction"); *Drayton v. Evatt*, 312 S.C. 4, 9, 430 S.E.2d 517, 520 (1993) ("Issues that could have been raised at trial or on direct appeal cannot be asserted in an application for post-conviction relief absent a claim of ineffective assistance of counsel."); *Simmons v. State*, 264 S.C. 417, 420-23, 215 S.E.2d 883-86 (1975) (concluding the following two issues were direct appeal issues, and therefore not properly raised in the post-conviction relief proceeding: "Whether the Trial Judge's rebuke of trial counsel constituted prejudicial error?" and "Whether it was prejudicial error for the Trial Judge to permit comment by the solicitor on Appellant's failure to call his wife as a witness when she was unavailable?"); *Stephenson v. Taylor*, Civ. A. No. 0:06-816-RBH, 2007 WL 1068247, at *2 (D.S.C. Mar. 30, 2007) (finding due process claim procedurally barred where, "even if under a liberal construction of the PCR application the issue is considered to have been raised before the PCR Judge, this was an issue that should have been raised on direct appeal and could not be raised on PCR except as to ineffective assistance of counsel").

As noted above, procedural default can be excused in certain circumstances. The undersigned recommends concluding none of those circumstances are present in the case *sub judice*. "[A]n attorney's errors during an appeal on direct review may provide cause to excuse a procedural default. . . ." *Martinez v. Ryan*, 566 U.S. 1, 11 (2012). However, there is no such error here. Moreover, while claims of insufficient evidence are cognizable on collateral review, "a federal court's review of such claims is 'sharply limited.'" *Wilson v. Greene*, 155 F.3d 396, 405 (4th Cir. 1998). As the Fourth Circuit stated in *Wilson*,

Federal review of the sufficiency of the evidence to support a state conviction is not meant to consider anew the jury's guilt determination or to replace the state's system of direct appellate review. Thus, a defendant is entitled to relief only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt.

*Wilson*, 155 F.3d at 405-06 (internal quotation marks and citations omitted).

In the case *sub judice*, Petitioner is not entitled to relief, as a rational trier of fact could have found her guilty beyond a reasonable doubt. As set forth in detail above, Iris Bryant testified she and Petitioner planned to rob the victim; she also testified that Petitioner shot the victim while Petitioner was sitting in the back seat of the victim's Mercedes; an investigator testified that gunshot residue was found on the back of the driver's seat and that when the victim was found, his left pants pocket was pulled out.

There was evidence presented at trial that Petitioner, in the course of her employment, was issued a .357 Magnum; that Petitioner's last day was in October of 2001; and that Petitioner had not returned the gun as of November 29, 2001. (R. at 618-28.) There was also evidence that the shell casings collected in this case were either a .38 Special caliber bullet or "originally loaded into some .38 caliber cartridges." (R. at 742.)[5]

Additionally, Heidi Feagin testified that she worked at Calloways in October of 2001. (R. at 297-99.) She testified that she knew Brennan as a regular customer; she stated that he came in to Calloways to shoot pool every now and then. (R. at 299-300.) She testified that on the night Brennan was murdered, she was his waitress at Calloways. (R. at 300.) According to Feagin, Brennan was with "two females that were younger than he was." (R. at 300.) Feagin testified that Brennan and the two ladies placed their order at 8:18PM on the evening of October 25, 2001. (R. at 300-01.) When asked what they looked like, Feagin stated that one of the ladies "was more stocky build, medium build," and the other "was thinner and very young looking." (R. at 302.) Feagin stated that she did not recall what the thinner woman was wearing, but the "stockier female" was "wearing a

_____

[5]David Collins testified that he worked "in the forensic laboratory [of the Richland County Sheriff's Department] as a firearms and tool marks examiner." (R. at 735-36.) According to Mr. Collins, it is "common for .38 Special ammunition to be used in a .357." (R. at 747; *see also* R. at 742-47.) He testified that a .357 Magnum could have fired the bullets found at the crime scene. (R. at 754.)

bright colored shirt" that Feagin "believe[d] . . . was orange." (R. at 302-03.) Feagin identified Petitioner in court as one of the women she saw with Bernard Brennan on the night of October 25, 2001. (R. at 355-56.) Furthermore, Falisha Hallmon testified that Petitioner told her that she shot Bernard Brennan and that she had been wearing an orange shirt that night. (R. at 597, 602.) While there may have been no fingerprints or DNA connecting Petitioner to the crimes, the State presented a great deal of evidence that Petitioner was guilty of murder and armed robbery. Accordingly, the undersigned recommends granting Respondent's Motion for Summary Judgment as to Ground Two.

## C.    **Ground Three**

Petitioner contends in Ground Three that the trial court "err[ed] by ruling a prior inconsistent statement concerning third-party guilt [was] admissible." (Dkt. No. 1 at 9 of 17.) As "supporting facts," Petitioner states (verbatim), "Because this was a murder trial where someone was deceased and another incarcerated for life, due to false statements by the State's key witness." (Dkt. No. 1 at 9 of 17.) Presumably Petitioner attempts to raise the same claim she raised in Ground One on her direct appeal. (*See* Dkt. No. 15-1 at 6 of 36.) In her brief, Petitioner argued, *inter alia*,

> The court erred by refusing to allow defense witness Alana Quattlebaum testify that co-defendant Iris Bryant told her in jail that Nikki was with her when the decedent was shot, and that Nikki shot the decedent. Bryant had told the police on a prior occasion that Nikki was present. Further Bryant later testified that her statement that Nikki was present was a lie. Bryant's admission to Quattlebaum was admissible as a prior inconsistent statement, and the judge's refusal to allow it on the basis that it was inadmissible evidence of third-party guilt was erroneous. *State v. Holmes* is no longer good law.

(Dkt. No. 15-1 at 23 of 36.)

The South Carolina Court of Appeals addressed this claim of error in depth. *See State v. Rice*, 375 S.C. 302, 652 S.E.2d 409 (Ct. App. 2007). The court first "question[ed] whether the issue regarding third-party guilt [was] preserved for . . . review," noting that "[w]hen initially raised, trial counsel specifically stated, 'I'm not going to argue third-party guilt that this other person did it' and 'I don't plan to argue third-party guilt.'" *Rice*, 375 S.C. at 317, 652 S.E.2d at 416. The court noted that "[t]rial counsel stated he was offering the evidence solely to impeach Bryant's testimony." *Id.* at 317, 652 S.E.2d at 416. The trial judge "opined the statement suggested third-party guilt and

asked trial counsel, 'I assume no other evidence related to' the third party other than this statement is going to be presented." *Id.* at 317, 652 S.E.2d at 416. As "[t]rial counsel offered nothing further[,]" the "trial court did not analyze third-party guilt in depth or rule on the issue." *Id.* at 317, 652 S.E.2d at 416.

The South Carolina Court of Appeals noted that pursuant to Rule 801(d)(1) of the South Carolina Rules of Evidence, "a prior statement by a witness is not hearsay and is admissible if [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is inconsistent with the declarant's testimony." *Rice*, 375 S.C. at 317, 652 S.E.2d at 416. The court noted that in Rice's case, however, "the admissibility of a prior inconsistent statement containing substantive evidence of third-party guilt requires further scrutiny," as the South Carolina Supreme Court "has imposed strict limitations on the admissibility of testimony indicating third-party guilt." *Id.* at 317, 652 S.E.2d at 416 (citing *State v. Mansfield*, 343 S.C. 66, 81, 538 S.E.2d 257, 265 (Ct. App. 2000)). The court in *Rice* noted that "[e]vidence offered by a defendant as to the commission of the crime by another person is limited to facts which are inconsistent with the defendant's guilt," and "[t]he evidence must raise a reasonable inference as to the accused's innocence." *Id.* at 317, 652 S.E.2d at 416 (citing *Mansfield*, 343 S.C. at 81, 538 S.E.2d at 265). The *Rice* court quoted the following passage from *State v. Gregory*, 198 S.C. 98, 16 S.E.2d 532 (1941):

> [E]vidence which can have (no) other effect than to cast a bare suspicion upon another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible. . . . But before such testimony can be received, there must be such proof of connection with it, such a train of facts or circumstances, as tends clearly to point out such other person as the guilty party. Remote acts, disconnected and outside the crime itself, cannot be separately proved for such a purpose. An orderly and unbiased judicial inquiry as to the guilt or innocence of a defendant on trial does not contemplate that such defendant be permitted, by way of defense, to indulge in conjectural inferences that some other person might have committed the offense for which he is on trial, or by fanciful analogy to say to the jury that someone other than he is more probably guilty.

*Rice*, 375 S.C. at 317-18, 652 S.E.2d at 416-17 (quoting *Gregory*, 198 S.C. at 104-05, 16 S.E.2d at 534-35). The court in *Rice* noted that even if testimony is inadmissible as "substantive evidence of

third-party guilt, it may, nevertheless, still be admissible for impeachment purposes." *Id*. at 318, 652 S.E.2d at 417 (citation omitted).

The court in *Rice* then noted the United States Supreme Court's opinion in *Holmes v. South Carolina*, 547 U.S. 319 (2006), and quoted from it extensively. *See Rice*, 375 S.C. at 318-21, 652 S.E.2d at 417-18. The *Rice* court then stated,

> Despite previously professing intentions not to argue third-party guilt, Rice raised the issue again after Quattlebaum testified, citing *State v. Holmes*, 605 S.E.2d 19, 361 S.C. 333 (2004). Rice attempted to introduce evidence implicating Tiki by showing that a composite sketch of the suspect identified as Rice looked remarkably like Tiki. In addition, Rice maintained Bryant previously named Nikki as the murderer.

> The trial court found the evidence failed to meet the standard in *State v. Holmes* or the "long line of cases" addressing third-party guilt. Accordingly, Quattlebaum could relate only that Bryant told her it was not Rice who had committed the crime. Quattlebaum was specifically prohibited from testifying that Bryant said Nikki (or Tiki) killed Brennan. The trial court concluded:

>> [A]s part of a defendant's defense, it is not proper to just raise this, well somebody else could have done it . . . unless you have a specific chain of facts and circumstances to satisfy the standards for third-party evidence . . . .

>> [T]hese inferences in front of the jury about some third person and vague references like that are specifically what's prohibited and it's been ruled not to be a part of a defendant's constitutional rights to maintain their innocence on something as to point vaguely to some third person . . . .

>> You can impeach a witness and that's not the issue. The issue is, [sic] is whether you can bring up this third person who is not in front of the jury other than in this vague way. And there is, as I understand from defense counsel, no other evidence creating a chain of circumstances in facts that would indicate third-party guilt . . . .

>> I'll let you ask her if she ever made the statement that it wasn't her [Rice], but without getting into this issue that it was somebody else who did it.

> The trial court adhered to the *Gregory* rule and applied the proper standard for admission of third-party guilt evidence—there must be such proof of connection with the crime, such a train of facts or circumstances, as tends clearly to point out such other person as the guilty party. The evidence Rice asserted in support of

introducing the third-party guilt testimony implicated Nikki at times, and Tiki at times, with no clarification as to whether they were the same individual. The record is void of facts or circumstances, other than Bryant's inconsistent statements, linking anyone other than Rice to Brennan's murder. The proffered evidence casts a mere "bare suspicion" on Nikki or Tiki and fails to connect either to the murder by way of the facts and circumstances surrounding the crime.

Moreover, any error in the trial court's ruling was harmless. Quattlebaum confirmed that Bryant's prior statement: (1) indicated Rice had nothing to do with Brennan's murder; and (2) was inconsistent with Bryant's trial testimony, thus impeaching her truthfulness, as defense counsel had originally intended. Additionally, the jury heard multiple times from Bryant on direct and cross-examination that she, at one point, told police Nikki had been involved in the murder. The trial court appropriately permitted Quattlebaum's testimony about Bryant's prior statement, tailored for impeachment purposes only, and excluded the portion of the statement that substantively pointed to the guilt of a third party.

*Rice*, 375 S.C. at 321-22, 652 S.E.2d at 418-19.

The state court's rejection of this claim is not contrary to, or an unreasonable application of, clearly established federal law, nor did the state court adjudication result in an unreasonable determination of the facts. In *Holmes v. South Carolina*, 547 U.S. 319 (2006), the Supreme Court addressed the question of "whether a criminal defendant's federal constitutional rights are violated by an evidence rule under which the defendant may not introduce proof of third-party guilt if the prosecution has introduced forensic evidence that, if believed, strongly supports a guilty verdict." *Holmes*, 547 U.S. at 321. The petitioner in that case was on trial for murder, first-degree criminal sexual conduct, first-degree burglary, and robbery. *Id*. at 321-22. The prosecution "relied heavily" on certain forensic evidence and "introduced evidence that petitioner had been seen near [the victim's] home within an hour of the time when, according to the prosecution's evidence, the attack took place." *Id*. at 322.

A "major part" of the defense for the petitioner in *Holmes* was his "attempt[] to undermine the State's forensic evidence by suggesting that it had been contaminated and that certain law enforcement officers had engaged in a plot to frame him." *Id*. The petitioner's expert "criticized the procedures used by the police in handling the fiber and DNA evidence and in collecting the fingerprint evidence," and "[a]nother defense expert provided testimony that petitioner cited as

supporting his claim that the palm print had been planted by the police." *Id.* at 322-23. The Court also noted the following:

> Petitioner also sought to introduce proof that another man, Jimmy McCaw White, had attacked [the victim]. At a pretrial hearing, petitioner proffered several witnesses who placed White in the victim's neighborhood on the morning of the assault, as well as four other witnesses who testified that White had either acknowledged that petitioner was "innocent" or had actually admitted to committing the crimes. One witness recounted that when he asked White about the "word . . . on the street" that White was responsible for [the] murder, White put his head down and he raised his head back up and he said, well, you know I like older women. According to this witness, White added that he did what they say he did and that he had no regrets about it at all. Another witness, who had been incarcerated with White, testified that White had admitted to assaulting [the victim], that a police officer had asked the witness to testify falsely against petitioner, and that employees of the prosecutor's office, while soliciting the witness' cooperation, had spoken of manufacturing evidence against petitioner. White testified at the pretrial hearing and denied making the incriminating statements. He also provided an alibi for the time of the crime, but another witness refuted his alibi.

*Holmes*, 547 U.S. at 323 (internal quotation marks and citations omitted). The Court noted that the trial court, citing *Gregory*, excluded the petitioner's third-party guilt evidence. *Holmes*, 547 U.S. at 323-24 (citing *State v. Gregory*, 198 S.C. 98, 16 S.E.2d 532 (1941)).

The *Holmes* Court continued,

> On appeal, the South Carolina Supreme Court found no error in the exclusion of petitioner's third-party guilt evidence. Citing both *Gregory* and its later decision in *State v. Gay*, 343 S.C. 543, 541 S.E.2d 541 (2001), the State Supreme Court held that "where there is strong evidence of an appellant's guilt, especially where there is strong forensic evidence, the proffered evidence about a third party's alleged guilt does not raise a reasonable inference as to the appellant's own innocence." 361 S.C., at 342–343, 605 S.E.2d, at 24. Applying this standard, the court held that petitioner could not "overcome the forensic evidence against him to raise a reasonable inference of his own innocence." *Id.*, at 343, 605 S.E.2d, at 24.

*Holmes*, 547 U.S. at 324.

The Court noted that "[s]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," but the "latitude . . . has limits." *Id.* The Constitution "guarantees criminal defendants a meaningful opportunity to present a complete defense," and that "right is abridged by evidence rules that infring[e] upon a weighty

interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Id*. at 324-25 (internal quotation marks and citations omitted). The Court in *Holmes* stated,

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. Plainly referring to rules of this type, we have stated that the Constitution permits judges to exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice,[or] confusion of the issues.
>
> A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged. *See, e.g.*, 41 C.J.S., Homicide § 216, pp. 56-58 (1991) ("Evidence tending to show the commission by another person of the crime charged may be introduced by accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded"); 40A Am.Jur.2d, Homicide § 286, pp. 136–138 (1999) ("[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged . . . . [Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial" (footnotes omitted)). Such rules are widely accepted,* and neither petitioner nor his *amici* challenge them here.

*Holmes*, 547 U.S. at 326-27 (some citations omitted). In the starred footnote, the Court cited numerous cases, including *State v. Gregory*, 198 S.C. 98, 16 S.E.2d 532 (1941). *See Holmes*, 547 U.S. at 327 n.*.

The Court noted that in the case before it and *Gay*, "the South Carolina Supreme Court radically changed and extended the rule." *Holmes*, 547 U.S. at 328 (citing *State v. Gay*, 343 S.C. 543, 541 S.E.2d 541 (2001)). In the case before it and *Gay*, the Supreme Court of South Carolina "applied the rule that where there is strong evidence of [a defendant's] guilt, especially where there is strong forensic evidence, the proffered evidence about a third party's alleged guilt may (or perhaps must) be excluded." *Holmes*, 547 U.S. at 329 (internal quotation marks and citation excluded). In vacating the judgment of the South Carolina Supreme Court, the Court stated,

Under this rule, the trial judge does not focus on the probative value or the potential adverse effects of admitting the defense evidence of third-party guilt. Instead, the critical inquiry concerns the strength of the prosecution's case: If the prosecution's case is strong enough, the evidence of third-party guilt is excluded even if that evidence, if viewed independently, would have great probative value and even if it would not pose an undue risk of harassment, prejudice, or confusion of the issues.

Furthermore, as applied in this case, the South Carolina Supreme Court's rule seems to call for little, if any, examination of the credibility of the prosecution's witnesses or the reliability of its evidence. Here, for example, the defense strenuously claimed that the prosecution's forensic evidence was so unreliable (due to mishandling and a deliberate plot to frame petitioner) that the evidence should not have even been admitted. The South Carolina Supreme Court responded that these challenges did not entirely "eviscerate" the forensic evidence and that the defense challenges went to the weight and not to the admissibility of that evidence. Yet, in evaluating the prosecution's forensic evidence and deeming it to be "strong"—and thereby justifying exclusion of petitioner's third-party guilt evidence—the South Carolina Supreme Court made no mention of the defense challenges to the prosecution's evidence.

Interpreted in this way, the rule applied by the State Supreme Court does not rationally serve the end that the *Gregory* rule and its analogues in other jurisdictions were designed to promote, *i.e.*, to focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues. The rule applied in this case appears to be based on the following logic: Where (1) it is clear that only one person was involved in the commission of a particular crime and (2) there is strong evidence that the defendant was the perpetrator, it follows that evidence of third-party guilt must be weak. But this logic depends on an accurate evaluation of the prosecution's proof, and the true strength of the prosecution's proof cannot be assessed without considering challenges to the reliability of the prosecution's evidence. Just because the prosecution's evidence, if credited, would provide strong support for a guilty verdict, it does not follow that evidence of third-party guilt has only a weak logical connection to the central issues in the case. And where the credibility of the prosecution's witnesses or the reliability of its evidence is not conceded, the strength of the prosecution's case cannot be assessed without making the sort of factual findings that have traditionally been reserved for the trier of fact and that the South Carolina courts did not purport to make in this case.

The rule applied in this case is no more logical than its converse would be, *i.e.*, a rule barring the prosecution from introducing evidence of a defendant's guilt if the defendant is able to proffer, at a pretrial hearing, evidence that, if believed, strongly supports a verdict of not guilty. In the present case, for example, petitioner proffered evidence that, if believed, squarely proved that White, not petitioner, was the perpetrator. It would make no sense, however, to hold that this proffer precluded

the prosecution from introducing its evidence, including the forensic evidence that, if credited, provided strong proof of petitioner's guilt.

The point is that, by evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt. Because the rule applied by the State Supreme Court in this case did not heed this point, the rule is "arbitrary" in the sense that it does not rationally serve the end that the *Gregory* rule and other similar third-party guilt rules were designed to further. Nor has the State identified any other legitimate end that the rule serves. It follows that the rule applied in this case by the State Supreme Court violates a criminal defendant's right to have a meaningful opportunity to present a complete defense.

*Holmes*, 547 U.S. at 329-31 (internal quotation marks and citations omitted).

The state court's application of *Holmes* in Rice's case was not contrary to, or an unreasonable application of, clearly established federal law, nor did the adjudication result in an unreasonable determination of the facts. *Holmes*, by the clear language of the opinion, did not abrogate *Gregory*. In Petitioner's case, the South Carolina Court of Appeals concluded the trial court "adhered to the *Gregory* rule and applied the proper standard for admission of third-party guilt evidence." *Rice*, 375 S.C. at 322, 652 S.E.2d at 419. As the *Rice* court noted, the evidence of third-party guilt "implicated Nikki at times, and Tiki at times, with no clarification as to whether they were the same individual." *Rice*, 375 S.C. at 322, 652 S.E.2d at 419.[6]

The undersigned's conclusion is supported by the Fourth Circuit's recent decision in *Hester v. Ballard*, 679 F. App'x 273 (4th Cir. Feb. 14, 2017). In *Hester*, the Fourth Circuit addressed the petitioner's claim that "the trial court's exclusion of the seminal fluid evidence prevented him from mounting a defense based on third-party guilt, violating his right under the Due Process Clause to present a meaningful defense." *Hester*, 679 F. App'x at 283. The Fourth Circuit noted that in *Holmes v. South Carolina*, 547 U.S. 319 (2006), the Court "prohibited trial courts from excluding evidence of third-party guilt based solely on the strength of the prosecution's evidence." *Hester*, 679 F. App'x at 283. In affirming the denial of habeas relief, the Fourth Circuit stated,

---

[6] In its order, the PCR court noted that "[w]hether Tiki and Nikki were the same person remains unresolved." (R. at 1246.)

But the *Holmes* Court specifically disclaimed any notion that its prohibition on allowing the strength of the prosecution's evidence to govern the admissibility of evidence of third-party guilt rendered unconstitutional every rule "regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged." *Id*. at 327, 126 S.Ct. 1727. According to the Court, many of these rules remain "widely accepted" and are not affected by the outcome in *Holmes*. *Id*. Notably for purposes of this case, one of the "widely accepted" evidentiary rules cited favorably by the *Holmes* Court and left untouched by the principle announced in Holmes was the rule in *State v. Parr*, 207 W.Va. 469, 534 S.E.2d 23 (2000) (per curiam). *Id*. at 327 n.*, 126 S.Ct. 1727.

In *Parr*, the Supreme Court of Appeals of West Virginia reiterated West Virginia's rule that "the admissibility of testimony implicating another person as having committed a crime hinges on a determination of whether the testimony tends to directly link such person to the crime, or whether it is instead purely speculative." 534 S.E.2d at 29 (quoting *State v. Harman*, 165 W.Va. 494, 270 S.E.2d 146, 150 (1980)). The "direct link" rule—cited favorably and left untouched by *Holmes*—was the same rule that the trial court applied to prohibit Petitioner from introducing the seminal fluid evidence, which Petitioner could not link to any particular third party and could only speculate may have belonged to Derrick Mickles, the boyfriend of M's mother. Such evidence tends to suggest "merely that another person had a motive or opportunity" to commit the crime and, thus, is inadmissible under West Virginia law. *Harman*, 270 S.E.2d at 150. Because *Holmes* cited *Parr* favorably and did not call into question the "direct link" rule's constitutionality, the state habeas court's approval of the exclusion of the seminal fluid evidence was not "an unreasonable application of" *Holmes*. 28 U.S.C. § 2254(d)(1).

*Hester*, 679 F. App'x at 283.

As explained in *Hester*, the *Holmes* Court left many evidentiary rules concerning third-party guilt "untouched." And, as in *Hester*, the state court's exclusion of testimony implicating Nikki or Tiki in the crime is not an unreasonable application of the rule set forth in *Holmes*.[7] *See Hester*, 679 F. App'x at 283; *see also Berry v. Palmer*, 518 F. App'x 336, 342-43 (6th Cir. 2013) (affirming the denial of habeas relief on claim that the exclusion of Jason Bible's testimony denied the petitioner the opportunity to present a defense, stating, "The aforementioned proffered testimony does not *squarely prove* that Miller could have committed the crimes. The *Gregory* rule, *State v. Gregory*, 198 S.C. 98, 16 S.E.2d 532, 534–35 (1941), referenced in *Holmes* . . . assert[s] that evidence casting

---

[7]Furthermore, as noted by the South Carolina Court of Appeals, Bryant admitted during her trial testimony that, at one point, she told police that another individual named "Nikki" had been in the vehicle at the time of the murder. (R. at 528.)

mere suspicion on another with no linking, substantive facts is not admissible. By their nature these rules rely on the probative value of proffered evidence before permitting exclusion. Indeed, *Holmes* held that exclusion of evidence establishing third-party guilt is 'arbitrary' where it does not rationally serve the end that these rules were designed to further. *Holmes*, 547 U.S. at 331, 126 S.Ct. 1727. It cannot be said that the exclusion of Bible's testimony was arbitrary where it does not tend to prove that Miller could have committed the crimes. The testimony is therefore not competently supported by facts, is speculative, and, as a result, the probative value is outweighed by the relevant factors."). The undersigned therefore recommends granting summary judgment to Respondent as to Ground Three.

## D.     Ground Four

In Ground Four, Petitioner contends the trial court "erred by" permitting "an in-court identification that was unreliable." (Dkt. No. 1 at 11 of 17.) Petitioner states (verbatim),

> Feag[i]n was giving a photo line-up of all individuals including the suspect (me Carmen) and I wasn't picked out until placed in court on trial between two attorneys [sic] charged w/ murder & armed robbery.

(Dkt. No. 1 at 11 of 17.)

Petitioner raised this ground in her direct appeal. The South Carolina Court of Appeals noted Petitioner's argument that the trial court "erred in admitting Heidi Feagin's in-court identification, maintaining it was unreliable and posed a substantial risk of misidentification." *Rice*, 375 S.C. at 326, 652 S.E.2d at 421. The court stated,

> The admissibility of an in-court identification is frequently challenged by a criminal defendant on the grounds that a pre-trial identification procedure was unduly suggestive. *See e.g., Moore*, 343 S.C. at 286, 540 S.E.2d at 447 ("An in-court identification of an accused is inadmissible if a suggestive out-of-court identification procedure created a very substantial likelihood of irreparable misidentification."). In those cases, the standard for determining the admissibility of both out-of-court and in-court identifications is whether the identification procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *State v. Gambrell*, 274 S.C. 587, 590, 266 S.E.2d 78, 80 (1980). A criminal defendant may be deprived of due process of law by an identification procedure that is unnecessarily suggestive and conducive to irreparable mistaken identification. *State v. Mansfield*, 343 S.C. 66, 77, 538 S.E.2d 257, 263 (Ct. App.2000).

> A court must consider the totality of circumstances to determine whether an identification may be reliable even when the procedure has been suggestive. *See Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The factors to be considered in evaluating the likelihood of misidentification include: (1) the opportunity of the witness to view the accused; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.*

*Rice*, 375 S.C. at 326-27, 652 S.E.2d at 421.

Citing *State v. Lewis*, 363 S.C. 37, 609 S.E.2d 515 (2005), however, the South Carolina Court of Appeals in *Rice* concluded that *Neil v. Biggers* was not applicable because there was no pretrial identification. *Rice*, 375 S.C. at 327-28, 652 S.E.2d at 421-22. The court stated, *inter alia*,

> A diligent search of the evidentiary record reveals no evidence whatsoever of a witness identification involving Rice prior to Feagin's in-court identification. The extant record convinces the court of the vivacity and applicability of the *Lewis* rule to the case *sub judice*.
>
> Here, the witness only identified Rice at trial, not at any time prior to trial. Therefore, the factors provided by *Neil* do not apply. The protections needed from suggestive pretrial identifications are not necessary in an in-court identification because of cross-examination and argument. Rice had the opportunity to cross-examine Feagin regarding her in-court identification. This was the proper remedy. The trial court did not err when it allowed the witness to make an in-court identification of Rice.

*Rice*, 375 S.C. at 328, 652 S.E.2d at 422.

The South Carolina Court of Appeals also concluded that "the record fully supports the trial court's ruling on the question of whether defense counsel 'opened the door' to allow Feagin's identification." *Rice*, 375 S.C. at 328, 652 S.E.2d at 422. The court noted that "South Carolina precedent has firmly established that otherwise inadmissible evidence may be properly admitted when opposing counsel 'opens the door' to that evidence," and "an appellant cannot complain of prejudice resulting from admission of evidence to which she opened the door." *Id*. at 328-29, 652 S.E.2d at 422 (citations omitted). The court stated,

> In the present case, during recross, defense counsel asked Feagin why she was able to assist in preparing composite sketches, "but now say you can't identify them because you didn't get a good look at them. How could you say all of those

things if you didn't get a good look at them?" Feagin responded, "I didn't say I couldn't identify them because I couldn't get a good look at them. It's been a long time, I'm sure I can still identify them, it's just been a long time since I had a look at them."

In an *in camera* hearing, the State asked the court to allow Feagin's in-court identification of Rice on redirect in "response to new matter brought up by the defense attorney during his recross." The prosecutor emphasized "[I] never asked her if she could identify them. [Defense counsel] asked her about that. And she responded that she could. The jury heard it . . . ."

Rice countered that the State laid the foundation for Feagin's in-court identification on direct examination, but stopped short of extracting it. The trial court reviewed direct, cross, redirect and recross testimony and ultimately determined:

> There was no discussion at all that I'm seeing that touched on the issue of whether or not she [Feagin] could make an identification here and now. I'm not seeing that at all in direct or redirect . . . .
>
> I thought that was where they [the State] were going, they never did. . . . Nobody ever brought up, an any point, until your [defense counsel's] last question to her, whether or not she could make an identification of the person if she saw them. It just never got brought up . . . .

Based on the review of the transcript, the trial court concluded defense counsel opened the door allowing the State to elicit Feagin's in-court identification. Rice cannot complain about the admission of identification evidence when she opened the door to that evidence.

*Rice*, 375 S.C. at 329-30, 652 S.E.2d at 422-23.

Thus, the South Carolina Supreme Court concluded that *Neil v. Biggers* did not apply in Rice's case, as her case involved an in-court identification only. Although Ms. Feagin identified Petitioner in court as one of the two individuals she saw with the victim at Calloways on the night he was murdered, she also testified that Petitioner's photograph was not part of the photographic lineup that she was shown in April of 2003. (*See* R. at 369-70, 377-95.)[8] Gene Mincey, an investigator with the Richland County Sheriff's Office, testified that he showed Feagin a lineup in April of 2003, and that lineup contained a photograph of Bryant but did not contain a photograph

---

[8]Ms. Feagin testified that she selected two photographs from the lineup but that she had indicated she was not sure if those were the two women with the victim at Calloways. (*See* R. at 394.)

of Petitioner. (R. at 954-61.) Mincey indicated that Feagin picked out two photographs (neither of which was Bryant), but that Feagin indicated she was not sure of the identification. (R. at 957-59.) Thus, while Petitioner claims that Feagin was shown a lineup containing her picture, and that Feagin failed to identify Petitioner until she saw Petitioner in court, the record does not support that assertion.

Here, the state court's rejection of the claim set forth in Ground Four is not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, nor was the state court's adjudication based on an unreasonable determination of the facts. The undersigned therefore recommends granting summary judgment to Respondent as to Ground Four. *See Gunnels v. Cartledge*, 669 F. App'x 165, 165-66 (4th Cir. Oct. 12, 2016) (denying a certificate of appealability on the petitioner's claim that the "district court erred in ruling that a victim's identification of [the petitioner] was admissible" where the petitioner claimed that the district court should have weighed the factors in *Neil v. Biggers* "in determining whether the victim's in-court identification of [the petitioner] was admissible," stating, "[T]he Supreme Court of South Carolina has 'conclude[d], as the majority of courts have, that *Neil v. Biggers* does not apply to in-court identifications and that the remedy for any alleged suggestiveness of an in-court identification is cross-examination and argument.' *State v. Lewis*, 363 S.C. 37, 609 S.E.2d 515, 518 (2005). This refusal to extend *Biggers* to in-court identifications forecloses [the petitioner's] argument on federal habeas review that *Biggers* applies to his case."); *see also Luckett v. Adams*, 200 F. App'x 703, 704 (9th Cir. 2006) ("Admission of eyewitness testimony against [the petitioner] is not reversible error because no Supreme Court case has extended the protections of *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), and its progeny to cases where the eyewitness first identifies the defendant at a pretrial hearing.").

## CONCLUSION

It is RECOMMENDED, for the foregoing reasons, that Respondent's Motion for Summary Judgment (Dkt. No. 16) be GRANTED; that the Petitioner's habeas petition be DISMISSED WITH PREJUDICE; and that a certificate of appealability be denied.[9]

IT IS SO RECOMMENDED.

MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

July 31, 2017
Charleston, South Carolina

**The parties' attention is directed to the important notice on the next page.**

---

[9]Title 28, Section 2253 provides in relevant part,
(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
(B) the final order in a proceeding under section 2255.

28 U.S.C. § 2253. A prisoner satisfies this standard by demonstrating that reasonable jurists would find this court's assessment of his constitutional claims debatable or wrong and that any dispositive procedural ruling by the district court is likewise debatable. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Rose v. Lee*, 252 F.3d 676, 683 (4th Cir. 2001). In the case *sub judice*, the legal standard for a certificate of appealability has not been met. The undersigned therefore recommends that a certificate of appealability be denied.

## Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).